

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Wisconsin

| | |
|---|---|
| United States of America<br>v.<br>**VEGAS JONES (DOB 12/XX/1995)**<br><br>*Defendant(s)* | )<br>)<br>)  Case No. 25-M-350 (SCD)<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **October 2024 through April 7, 2025** in the county of **Milwaukee** in the **Eastern** District of **Wisconsin**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2, 4, 1001, 1071, 1503, 1073 | misprision; lying to federal agents; harboring and concealing a fugitive; obstruction of due administration of justice; aiding-and-abetting unlawful flight |

This criminal complaint is based on these facts:

Please see attached Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

James Buck, FBI SA
*Printed name and title*

Sworn to ~~before~~ me via telephone:

Date: 4-8-25

_____
*Judge's signature*

Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

City and state: Milwaukee, Wisconsin

**AFFIDAVIT IN SUPPORT OF COMPLAINT**

I, James Buck, being first duly sworn, hereby depose and state as follows:

**I.   BACKGROUND**

1. I make this affidavit in support of a complaint under Rules 3, 4 and 4.1 of the Federal Rules of Criminal Procedure and request an arrest warrant naming Vegas Jones ("JONES").

2. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been since June 2023. Since June of 2023, I have been assigned to the FBI's Milwaukee Area Safe Streets Task Force (MASSTF), a multi-jurisdictional law enforcement entity charged with investigating violations of federal law, including narcotics trafficking and conspiracy to possess narcotics with intent to distribute as defined under Title 21 of the United States Code, I have been trained in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause. I have participated in criminal investigations, surveillance, search warrants, interviews, and debriefs of arrested subjects. As a result of this training and investigative experience, I have learned how and why narcotics traffickers typically conduct various aspects of their criminal activities. I have experience in the investigation of individuals involved in federal criminal offenses, the use of cellular devices to commit those offenses, and the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their location.

3. I have experience in the investigation, apprehension, and prosecution of individuals involved in federal criminal offenses, the use of cellular devices to commit

1

those offenses, and the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their location.

4. I have been trained in a variety of investigative and legal matters, including the topics of Fourth Amendment searches, the drafting of search warrant affidavits, and probable cause. I have participated in criminal investigations, surveillance, search warrants, interviews, and debriefs of arrested subjects. As a result of this training and investigative experience, I have learned how and why criminal actors typically conduct various aspects of their criminal activities.

5. This affidavit is based upon my personal knowledge and upon information reported to me by other federal and local law enforcement officers, during the course of their official duties, all of whom I believe to be truthful and reliable. Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had contact regarding this investigation. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. Quotations and attributions in this affidavit are made in summary and substance, not verbatim.

6. This Affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

7. Based on my training and experience and the facts as set forth in this Affidavit, I submit that there is probable cause to believe that JONES has been involved

2

in violations of federal law, namely 18 U.S.C. §§ 2 (aiding-and-abetting); 4 (misprision); 1001 (lying to federal agents); 1071 (harboring and concealing a fugitive); 1503 (obstruction of due administration of justice); and 1073 (unlawful flight from prosecution) (collectively, the "Target Offenses").

## II. PROBABLE CAUSE

8. On October 1, 2024, an arrest warrant was issued for Dominique Williams ("WILLIAMS") by a United States Magistrate Judge for the Eastern District of Wisconsin, pursuant to a complaint captioned 24-MJ-187. On that same date, a search warrant (captioned 24-MJ-192) was issued for 1702 W. Capitol Drive, Milwaukee, Wisconsin, Dominique WILLIAMS' primary residence. The affidavits submitted in support of both documents are incorporated here by reference.

9. As more fully described in the affidavits previously incorporated here, and in the paragraphs below, law enforcement believes Dominque WILLIAMS led a drug trafficking organization ("DTO") based in the Eastern District of Wisconsin, and that he associates with Vegas JONES.

10. On September 5, 2024, Investigators believed that WILLIAMS would be having drugs trafficked from California to Milwaukee, WI. On September 6, 2024, Iowa State Police conducted a traffic stop on WILLIAMS' Mercedes sprinter van in Dallas County, Iowa. Upon searching the vehicle, law enforcement located approximately 24 kilograms of cocaine and 75 pounds of methamphetamine, with an estimated street value of 1.3 million dollars. WILLIAMS coordinated this shipment, as described in the previously incorporated documents.

3

11. On October 2, 2024, law enforcement officers attempted to execute search warrants and arrest warrants related to this investigation, including a search warrant at 1702 W. Capitol Drive, Milwaukee, WI. They established surveillance around 5:30AM (CST), anticipating that the search would begin at 6:00AM. At approximately 5:59AM, they observed a white Chevy van, known to have been utilized by N-Namdi WILLIAMS (Dominique WILLIAMS' father), leave 1702 W. Capitol Drive, Milwaukee, WI. The vehicle was originally traveling at an ordinary rate of speed, but as it proceeded away from the residence, the driver – believed to be N-Namdi WILLIAMS – would likely have been able to see law enforcement en route to the residence, driving distinctive vehicles (including their BearCat, tinted sedans, and the entry-team vehicle). At that point, the white van, believed to be driven by N-Namdi WILLIAMS, accelerated at a high rate of speed. Law enforcement elected to let the van drive away and execute the warrant at 1702 W. Capitol Drive, Milwaukee, WI, where they recovered documents and records believed to be reflective of the DTO's activities. On this same morning of October 2, 2024, law enforcement has searched other locations associated with the DTO, recovering substantial quantities of controlled substances and firearms.

12. Law enforcement also noted, via previously authorized electronic surveillance, that N-Namdi WILLIAMS, shortly after his suspected flight from law enforcement, attempted to contact his son Dominique WILLIAMS (who was in California, which is on Pacific Standard Time and therefore two hours ahead) multiple times via cellular telephone. More specifically:

- N-Namdi WILLIAMS called Dominique WILLIAMS at approximately

4

- 6:06AM (CST). It appears they did not speak, as the call duration is four seconds.
- N-Namdi WILLIAMS then called Dominique WILLIAMS again, at approximately 6:07AM (CST). It appears they spoke, as the call duration is one minute and forty-nine seconds. Shortly after this point, location data associated with Dominique WILLIAMS' phone reflects that he and his device left their present location and began to travel at a very high rate of speed, even though it was only shortly after 4AM at his location. Based on the duration and context, law enforcement believes that during this call, N-Namdi WILLIAMS advised Dominque WILLIAMS that law enforcement was attempting to execute search warrants, and he should flee.
- N-Namdi WILLIAMS next called Dominique WILLIAMS at approximately 7:45AM (CST). It appears they spoke, as the call duration three minutes and thirty-three seconds.

13. Law enforcement, using previously-authorized location data associated with WILLIAMS' other line, noted that WILLIAMS, shortly after contact with his father, began fleeing at a high rate of speed north, away from Santa Ana and towards Los Angeles. WILLIAMS appeared to stop using this other line later that morning, and law enforcement accordingly stopped receiving correlated location data.

14. Investigators conducted a toll analysis for all three of WILLIAMS' known phone numbers and found that JONES' device ending in x0555 was a top caller for WILLAMS on all three of his known phone numbers. JONES had 11 calls between September 3, 2024, and September 7, 2024, with WILLIAMS on 747-955-6842. During the same time, JONES had 37 calls with WILLIAMS on 626-654-9974. Lastly, JONES had 70 calls with WILLIAMS on 262-307-3681 between September 7, 2024, and October 1, 2024.

15. On November 15, 2024, VEGAS JONES, using (414) 204-0555, received an inmate collect call from Inmate: 656723 – KEAIRA N. WALKER. JONES stated, "My man gone now." WALKER asked, "What you mean he gone?" JONES stated, "He gone, he

5

on the run." Shortly after, JONES stated, "My man called so many times last night [Unintelligble] I was so tired, dead asleep... he facetimed at 1, 2, 3, 5 are you trying to clock and see if I'm with somebody... I'm not with nobody." WALKER said, "No, are you saying like is you cool?" JONES stated, "I'm not doing nothing... and wherever he at time is different. Like stop [Unintelligible]." WALKER replied, "He must not know you a loyal ass bitch." JONES replied, "He don't cuz he don't know me like that, we've only been talking going 2 years... He don't know me, he know me a lil bit, he don't know me... he learning, he learning." JONES stated, "He was smiling hard as a bitch when he seen I was at the group home moving that lady in like yeah boo right choice... you picked the right bitch, cuz all you had to do was give me that motherfucking house, bitch you ain't have to do nothing else, bitch I was gonna get the job done." Investigators believe this call to refer to JONES discussing with WALKER that her "man" is DOMINIQUE WILLIAMS, who currently is a fugitive. Investigators believe that WILLIAMS is the "man" who is facetiming JONES and provided her with the group home location which she is now operating.

16. On November 23, 2024, JONES, using (414) 204-0555, received an inmate collect call from Inmate: 656723 – KEAIRA N. WALKER. WALKER asked, "How you and your man doing?" JONES stated, "Um, he okay, he still gone." WALKER stated, "I bet he is. Shit, I'd be gone too." JONES replied, "Mhmm, [UNINTELLIGBLE] He gone, he ain't coming back, he still gone though... He ain't coming back till they put the clinks on his ass." WALKER asked, "Is you gone fly?" JONES replied, "Umm, in so many words let me tell you... In so many words I already did." WALKER replied, "Okay."

6

JONES stated, "But, I just trying to be underneath the radar cuz you ain't no telling who they watching." WALKER stated, "Yeah, you gotta be smart with that type of shit." JONES replied, "Yeah that's why, he think a motherfucker [UNINTELLIGIBLE], I'm like you better be glad a motherfucker got away with that one time." WALKER stated, "That's that good pussy." JONES stated, "I thought he was saying that to be saying that but I fucking got some good pussy." WALKER laughed. JONES said, "Keaira, a motherfucker willing to going to jail to fuck... oh wow." WALKER laughed, "You a clown!" JONES replied, "You really willing to risk your freedom to fuck, oh wow... that motherfucker must be some good." WALKER stated, "Nah for real g, you for real... that's insane!" JONES replied, "That's what I'm saying, I couldn't believe it... I was like you serious? He was like 'hell yeah'. I'm like oh your ass ready to go to jail." JONES continued to talk about his personality changing since, "before all this shit was going on", but that she will not get upset with him because of his current situation. JONES further stated, "like if I said, Domo, you happy as fuck going through this cuz I can't even cuss you out." Investigators believe this call to refer to JONES stating that she has traveled to meet with WILLIAMS which she understood to be very risky for WILLIAMS and that WILLIAMS was willing to risk apprehension by law enforcement to meet and have sex. During the course of the conversation, JONES references the nickname "Domo" which investigators know to be an alias for DOMINIQUE WILLIAMS. Investigators believe that JONES is fully aware that WILLIAMS is a fugitive from justice and is attempting to covertly maintain contact WILLIAMS due to concerns that law enforcement is watching and/or monitoring jail calls involving JONES.

7

17. On December 12, 2024, VEGAS JONES, using (414) 204-0555, received an inmate collect call from Inmate: 656723 – KEAIRA N. WALKER. JONES stated, "I just got back in town." WALKER asked, "Where you was at?" JONES replied, "Put up somewhere." WALKER replied, "Aw, you got a visit?" JONES replied, "Mhmm, you ain't pregnant?" JONES stated, "Hell naw, I took a Plan B." WALKER laughed and stated, "He loves that pussy... boy." Later in the call, JONES stated, "He finna be in jail and never getting out." WALKER replied, "Stop playing, for real you play too much." JONES said, "On my momma, like that boy, when I say never, I mean like a long ass time." WALKER asked, "Damn they got that much on him?" JONES replied, "Mhmm." WALKER replied, "He done." JONES stated, "They telling." WALKER asked, "You said motherfuckers telling?" JONES replied, "Mhmm." WALKER said, "Yup, and while he think he free on the run... that's the time to handle the business, man." JONES replied, "It's over." WALKER asked, "Is the motherfucker that's doing it out?" JONES replied, "Umm, everybody out except one, two people, and him. Everybody else got caught." Investigators believe this call to refer to JONES stating that she recently traveled to visit and have sex with WILLIAMS. Investigators believe that over the course of the call, JONES refers to WILLIAMS' associates were all arrested with the exception of one or two people in addition to WILLIAMS that are out of custody. JONES stated that people are "telling" which investigators understand to refer to WILLIAMS' associates working with law enforcement.

18. On February 2, 2025, JONES, using (414) 204-0555, received an inmate collect call from Inmate: 648469 - Tequila L. COLE. COLE asked if JONES would close

8

down her daycare, to which JONES replied, "So you know I got three houses for the group home, this one I'm at on 19th and Lincoln. This open with people. The one on 27th Street, I been there all day, they just got done, I'm like decorating and stuff cuz the state coming out. And then I got one on 43rd and Hampton." COLE asked, "So do you know somebody who own properties?" JONES replied, "Yeah my man." COLE stated, "Okay, my mom looking for a crib." JONES asked, "Where's she want to live at? Tell her I got a house on 26th and Locust." COLE stated, "It ain't for her to stay in." JONES said, "What it's for her little business?" COLE replied, "Yeah". JONES responded, "We got house, we got two houses on 26th and Locust, we got a house on 16th and Walnut..." Investigators believe that JONES' "man" referenced here is WILLIAMS, given the investigation described above.

19. It should be noted that although the number ending in x0555 is used by JONES, it is listed in law enforcement databases to Dionne WREN, with an address of 2506 N 23rd Street.

20. On March 23, 2025, JONES, using (414) 204-0555, received an inmate collect call from Inmate: 2024014714 – DRAKKAR K. LOBLEY. JONES stated that the door at the group home she managed was broken and that she, "damn near can't leave till tomorrow". JONES stated, "I can't leave that like that, I can't go out of town and relax like that." LOBLEY asked, "Where you supposed to go?" JONES replied, "Umm, I'm supposed to be going to get my teeth done." LOBLEY replied, "I'll just ask you next week." JONES said, "Huh?" LOBLEY repeated, "I'll just ask you next week or something." JONES asked, "What?" and "I'll be back next week." LOBLEY asked, "You

9

said where'd you go to get your teeth?" JONES asked, "Huh?" LOBLEY asked, "Where you gonna get it?" JONES replied, "Umm, California."

21. On March 24, 2025, at approximately 1:55pm, cellular GPS locational data from JONES' phone number ending in x0555 was consistent with her being in the vicinity of 2463 S. 19TH Street, Milwaukee, WI. The GPS locational data indicated she next to be in the vicinity of 9811 Eschweiler Drive, Unit 201, Wauwatosa, WI. The locational data next suggests she traveled to the northside of Milwaukee before traveling to Chicago. At approximately 8:55pm, the cellular device pinged in the vicinity of Chicago O'Hare International Airport (ORD), followed by a loss of locational data until March 25, 2025, at approximately 1:15am, when it pinged at Los Angeles International Airport (LAX) in Los Angeles, California. After arriving in LAX, JONES's device travelled to a neighborhood in Los Angeles in close proximity to the airport.

22. Case agents next observed JONES' locational data travel northbound, pausing on the northside of the city of Los Angeles, and then rapidly traveling southbound back to the vicinity of LAX. The GPS locational data was consistent with her device being at LAX until approximately 4:15pm CDT, when the carrier failed to receive consistent cellular connection over the course of roughly 4-5 hours. Case agents believe the loss of the locational data to be JONES' departure from LAX via commercial aircraft. Based on cellular locational data, the approximate duration of JONES' visit to California constituted roughly 15 hours. On March 25, 2025, at approximately 8:25pm CDT, JONES' locational data was consistent her returning to ORD. JONES' locational data showed northwest bound travel at 8:35pm from ORD. JONES' locational data travelled

10

westbound and the northbound, showing a PING in the vicinity consistent with 2463 S 19th Street, Milwaukee, Wisconsin at approximately 10:15pm.

23. Case agents were later able to confirm that JONES flew on Spirit Airlines flight, Spirit 112, from Los Angeles International Airport Gate G10, Los Angeles, California at 1:53pm PDT on March 25, 2025, to Gate G10, Chicago O'Hare International Airport, Chicago Illinois at 7:52pm CDT on March 25, 2025.

24. Based on the very short nature of this trip, WILLIAMS' connection to JONES, JONES' stopping at two residence associated with WILLIAMS before this trip, their knowledge of this investigation thus far, the aforementioned tip, the aforementioned jail calls, and their knowledge of how drug traffickers and fugitives operate, case agents believe that JONES trip to Los Angeles was made in an effort to support WILLIAMS' in his flight from law enforcement.

25. Case agents believe that based on the timing of the departures and arrivals of JONES' cellular locational data at the airport, the toll data consistent with WILLIAMS' common callers, and the short duration of the travel to California, that JONES was traveling with the intended purpose of meeting WILLIAMS, likely taking United States Currency to him and conducting business on his behalf.

26. Case agents also know that data regarding the location of JONES's cellular device suggests she left the Milwaukee area on or about April 3, 2025, landed in Miami, and spent the weekend there. Law enforcement also learned that JONES booked a flight home for April 7, 2025, and location data associated with her phone placed her at the Miami airport on that day, suggesting she is preparing to return home around that same

11

date. This development is significant because it provides an illustrative contrast to JONES's trip to Los Angeles. When JONES is traveling to an area of the country historically connected to WILLIAMS, like Los Angeles, she stays for a suspiciously short period of time; in contract, when she travels to an area of the country not historically connected to WILLIAMS, like Miami, she spends the weekend, which agents know is more consistent with a typical vacation.

27. On March 29, 2025, JONES, using (414) 204-0555, received an inmate collect call from Inmate: 2024014714 – DRAKKAR K. LOBLEY. LOBLEY asked JONES if she got her "teeth did" to which JONES stated, "Yeah I went and got my teeth did." LOBLEY asked, "They look good?" followed by a long pause, and LOBLEY asking "Hello?" JONES replied, "You so stupid, I swear to god" and laughed. LOBLEY asked, "What I do?" JONES replied, "Nothing, we'll laugh about it later." Only moments later, JONES stated "I just got back in town, actually just pulled back in." Later in the call, LOBLEY asked, "How much they charge you for your teeth?" JONES replied, "30". The conversation switched topics until JONES stated, "Is you listening to me, I don't play about my smile, that's the best thing that ever happened to me." LOBLEY replied, "That's what I was thinking about, getting my teeth did." JONES repeated, "Is you listening to me?" LOBLEY replied, "I'm listening." JONES stated, "I had to go get my teeth done because… that was my only chance to go get it and it was thirty-thousand, and you gone play about my teeth, so I had to go out there and take that dentist his money." JONES asked, "You hear me?" LOBLEY stated, "I know what you did." JONES stated, "Mhmm, that dentist [UNINTELLIGBLE] is the best thing that ever happened to me, okay? So I

12

had to hurry up and go out there while that slot was available and hurry up and take him that because I don't play about my motherfucking smile or my dentist okay?" LOBLEY replied, "Y'all locked in for life." JONES stated, "Me and my dentist locked in forever." Case agents believe this conversation to refer to JONES cryptically attempting to tell LOBLEY that she did not actually travel to get jewelry placed in her teeth, but rather took $30,000 to DOMINIQUE WILLIAMS a.k.a. "that dentist" who she has a romantic relationship with ("Me and my dentist locked in forever"). LOBLEY initially failed to understand the code that JONES was utilizing during the recorded jail call, but after repeated attempts by JONES to insinuate her true meaning, LOBLEY stated that he understood her coded message.

28. Agents obtained a warrant to search JONES's person and devices on April 7, 2025. On that date, they conducted a voluntary interview of her outside her address on 19th Street in Milwaukee. During the course of the conversation, case agents asked JONES if she knew who Dominique Williams a.k.a. "Domo" was, to which she replied that she did knew him. Case agents then asked if JONES has spoken with or seen WILLIAMS since October. JONES asked what the significance of October 2024 was, and case agents specified that WILLIAMS' fugitive status began on October 2, 2024. JONES stated that she had not seen or spoken to WILLIAMS since he was on the run.

29. Three cellular devices were seized from JONES outside the residence at on 19th Street. Phone #1 and Phone #2 were in JONES' possession and both utilized the phone number (414) 204-0555. Phone #3 was in JONES' possession and utilized the phone number (414) 373-1152. Phone #3 contained only two contacts, one listing to

13

"Vegas Jones" with the gmail account "harris113010@gmail.com" and no assigned phone number, and one listing to "My Man." While reviewing these devices, investigators observed messaging conversations that reflect JONES' current communication with WILLIAMS. The following conversations, in sum and substance, were extracted from JONES' devices, reviewed by case agents, and deemed—based on agents' training, experience, and knowledge of the investigation to date—to reflect JONES' knowledge of WILLIAMS' fugitive status and her efforts to conduct clandestine meetings with him, and her obstruction of law enforcement efforts to capture WILLIAMS.

30. On or about March 24, 2025, JONES had a conversation on Phone #2 with "Deililah," which she references perhaps having to "say" she was getting her "teeth done."

> JONES: Send me your confirmation for your teeth so I can edit it
>
> JONES: In case I gotta say I'm going to get my teeth done
>
> DEILILAH: No, didn't pay yet I just got the information what they charge me
>
> JONES: The old one
>
> DEILILAH: I didn't go there
>
> JONES: Ima edit
>
> DEILILAH: (Sent a payment receipt)

31. Case agents believe, based on their training, experience, and investigation to date, that this text conversation reflects JONES fabricating an alibi for her trip down to California. More specifically, she is generating documents to support the pretense that she is having dental work performed there. Case agents know that historically and

14

currently, JONES has braces and would not be able to be fit or don a cosmetic grill due to the orthodontic appliance she currently wears. Case agents believe that JONES traveled down to California specifically to meet with WILLIAMS as referenced in the recorded inmate collect calls with WALKER and LOBLEY.

32. Investigators also found messages in Phone #2 with "Damario", using (414-316-7890), which investigators know to be WILLIAMS' son. These messages were initiated on approximately December 23, 2024 (after WILLIAMS fled) and continued through March 23, 2025. Below, in sum and substance, is a message string from December 23 to December 25, 2024.

>JONES: Hey
>
>DAMARIO: Who This
>
>DAMARIO: Oh Hey
>
>VEGAS: FaceTime me
>
>DAMARIO: Yea?
>
>VEGAS: Your dad
>
>VEGAS: He said he beating yo ass
>
>DAMARIO: Why
>
>VEGAS: Cause you not answering

33. Investigators believe, based on their training, experience, and investigation to date, that this conversation reflects JONES acting as an intermediary between DAMARIO and his father, WILLIAMS. Investigators believe that JONES asked DAMARIO to facetime her on her phone using (414) 204-0555 because JONES was

15

utilizing her other phone to actively communicate with WILLIAMS for the purpose of having them interact.

34. On February 10, 2025, DAMARIO and JONES had the following conversation, in sum and substance.

> DAMARIO: Vegas
>
> JONES: Yes
>
> DAMARIO: Can you help get my uber
>
> JONES: Send me address
>
> DAMARIO: I got half of the money I only need 6$
>
> DAMARIO: You gone do it?
>
> JONES: I will send it FaceTime me Are you safe
>
> JONES: I just need to be able to tell your dad you ok I talk to you
>
> JONES: I will send you anything you need but you need to check in so he not worried about you
>
> DAMARIO: Yea im safe
>
> JONES: Wats yo cash app don't tell him I sent it
>
> JONES: Or you wanna save yo money
>
> JONES: N I send it
>
> JONES: Thank you for answering yo dad really be worried

35. Investigators believe, based on their training, experience, and investigation to date, that these conversations reflect JONES once again acting as an

intermediary between DAMARIO and WILLIAMS (DAMARIO's father). JONES asked if DAMARIO was safe so that she could "tell your dad you ok" so that "he not worried about you". Investigators believe that JONES was actively in communication with WILLIAMS and relaying messages on behalf of WILLIAMS to DAMARIO.

36. Investigators reviewed a video recorded on Phone # 1 found in JONES' possession at the time of seizure. The video was dated March 20, 2025, and was audio-only. That audio reflects a conversation between WILLIAMS and JONES. Investigators are familiar with the distinct voice patterns of WILLIAMS and JONES, having heard their voices many times over the course of this investigation. In sum and substance, JONES asked, "You said you need how much babe?" WILLIAMS replied, "40." JONES asked, "And you said bring all blues?" WILLIAMS responded, "And bring all hundreds, cuz it's smaller [UNINTELLIGBLE] you can put 20 in your purse and 20 in your carry-on." JONES replied, "Okay". Investigators believe, based on their training, experience, and investigation to date, that this conversation reflects WILLIAMS directing JONES to transport $40,000 in hundred dollar denominations, split in two separate locations under JONES' possession, $20,000 in "your purse" and $20,000 in "your carry-on". Investigators believe, based on their training, experience, and investigation to date, that that due to the date of video's creation, this conversation contains WILLIAMS' instructions for JONES in preparation for her trip to California, which occurs approximately 5 days later and involved her traveling via the airlines.

37. Investigators found, in the notes section of JONES Phone #1, a scanned document of a Florida Driver's License listing to DL#: R236-168-84-408-0 under the

17

name "DEANGELO HERBERT ROYSTER"; Address: 1660 NE 174th St, North Miami Beach, FL 33164; DOB: 11/08/1984; EXP: 11/08/2031; ISS: 11/02/2023; with the DL identification photograph of the face investigators know to be WILLIAMS. Investigators conducted queries of law enforcement databases for the Driver's License number and found no positive returns for Florida Driver's Licenses utilizing the above referenced Driver's License $. In addition, investigators queried law enforcement databases for the name "DEANGELO HERBERT ROYSTER" and DOB: 11/08/1984 and obtained a Wisconsin Driver's License photograph and demographics that do not match the photograph found on the scanned identification card document in JONES' Phone #1.

38. Furthermore, investigators found a WhatsApp encrypted messaging application account listed to "Vegas Jones", using (414) 204-0555 on Phone #1 that contained a conversation with an contact listed as "ID & SScard Plug." The dates of the conversation range from approximately June 22, 2020, to approximately March 10, 2025. Based on the conversation, the recovered image of a fraudulent ID card bearing WILLIAMS' likeness, their training and experience, and the investigation to date, investigators believe that JONES was involved in various forms of fraud since 2020, utilizing the contact listed "ID & SScard Plug" to obtain fraudulent pay stubs, social security cards, and Driver's License cards. During the messaged conversation JONES asked the contact for their Signal contact information, and in response, "ID & SScard Plug" provided a link under the contact "Rockey" via the encrypted messaging application, Signal. On March 10, 2025, JONES asked "Rockey" on Signal for a

18

Wisconsin birth certificate stating, "Ok can you make a birth certificate?" to which "Rockey" responded "Yes boss," and "I am telling it for bc." JONES replied, "Yes", "Do you make hard copies ?"; "I have a serious question"; and "If you need help getting out of the country can you help me ?". "Rockey" responded, "No" and "How can I help you." JONES stated, "I'm asking you do you know a way I can get over there without using my passport." "Rockey" replied, "No". JONES stated, "Ok I need a birth certificate" and followed her message with "badly." "Rockey" sent a copy of Wisconsin birth certificate along with the message "hello." JONES replied with "Color ?" and then failed to respond to any further messages from "Rockey." Investigators believe, based on their training, experience, and investigation to date, that these documents and conversations reflect JONES attempting to obtain fraudulent identification documents for herself and possibly for WILLIAMS, for the purpose of evading law enforcement apprehension and traveling outside the jurisdiction of the United States.